Again, this case, as you know, is a lot of moving pieces. We've given you 30 minutes per side for argument. Would you just explain how yours is going to be divided up? Your Honor, I'm the only attorney arguing for all plaintiffs. And I would like to reserve 10 minutes of my time for rebuttal. All right. And when we hear from the CNF-related parties, what is your arrangement? I'm going to do the Towers-Parents. We've divided it up between the four of us. So it is as efficient as we can. I'm going to address the state law and I'm going to do the Towers-Parents. OK, wait just a moment. So you'll do the Towers-Parents. I'm Towers-Parents. Mm-hmm. I intend to take 10 minutes, if possible. And I intend to address the state law and I'm going to do the Towers-Parents. Other counsels have divided up the preemption, the constitutional standing, and a few other issues. OK. Who will do what next? What comes after Towers-Parents? Senator, I'm going to tell them I represent the Administrative Committee on Defendants. And I'm going to talk principally about the Constitution. How long? Seven and a half minutes. Constitutional standing, seven and a half. I'm David Bacon. I represent the CNF Defendants. I'm going to talk about ERISA issues. I'm primarily not standing. I may address it a little bit. And I'd like to talk for seven and a half minutes, please. When you say primarily ERISA issues, could you illuminate that a little bit? Since the whole thing does have to do with ERISA. I'm sorry. What specifically, with respect to ERISA, are you addressing? I'm going to talk about the fact that Section 2A of ERISA, the spin-off provision, is not a fiduciary provision. All right. I'm going to talk about statute of limitations. And there's some unique standing issues as to my client. Okay. Thank you. Thank you. And you will speak for approximately how many minutes? Seven and a half. Charles Finke, Your Honor, for the Pension Benefit Guarantee Corporation. And I will address the PBGC issues in the remaining five minutes. Okay. Let's begin, then, with Ms. Reneker. Thank you. Good morning. May it please the Court. I'm Teresa Reneker, appearing on behalf of the plaintiffs. The plaintiffs in this case worked for as many as 36 years, only to learn, after retiring, that their pension plan lacked sufficient assets to pay all of their promised pensions. Now, the nature of a defined benefit pension plan is critical to this case. It is a plan that promises to pay a fixed monthly benefit to each participant from retirement until death. Because this payment obligation may commence many years in the future and can last for decades, the plan's funding must be evaluated regularly to determine whether its future assets will be sufficient to pay its future obligations. Assumptions about the future rate of investment return on the plan's assets and about the duration of its future payments to plan participants, that is, how long, when will they retire, and how long will they receive their benefit after retiring. These assumptions are critical to this evaluation of the plan's funding. In this case, the Consolidated Freightways Corporation pension plan, or CFC plan, was established in December 1996 by spinning off assets and liabilities from a pre-existing plan, the CNF plan. Those liabilities included, for the plaintiffs, their pensions earned over more than 20 years of service under the prior plan. Indeed, for some participants who were already retired at the time that the CFC plan was created, it included their entire pension. You know, I think we know the facts in terms of, and obviously, this is a terrible situation for, you know, for any number of reasons. But I kind of want you to jump into the standing issue on some that, since we do have a limited period of time, and the question that I would have for you, which would be helpful to me, is how is it that any potential recovery by appellants on their ERISA-based claims would not belong to PBGC given that, one, any recovery monetary would make the plan whole under 29 U.S.C. section 1109, and two, any increase in assets of the plan post-termination goes to PBGC's generalized funds under 29 U.S.C. section 1344C? These facts and the lack of mechanism by which the court could compel PBGC to transfer the recovery to the specific injured participants, you know, I'm thinking might appear to negate appellants' redressable injury under Article III standing purposes for their ERISA claims. I know we have the Fourth Circuit case, it's not Ninth Circuit, but the Wilmington shipping, that case doesn't identify any transfer mechanism. So I'd like you to kind of help me out on that. Well, certainly, if a recovery would make the plan whole, that would be the ideal outcome in this case, because, particularly from the plaintiff's perspective, because if the plan is made whole, they will receive the benefits that they have lost. And that is exactly the reason why the plaintiff had constitutional standing on his ERISA claims in Wilmington shipping. Even though he was receiving his full benefit under the PBGC's insurance program, if the plan were made whole for its losses, he could receive additional benefits that had been taken away from him, and particularly the ability to elect a lump sum form of payment. So there were two sections of Title IV ERISA that were cited. The first one is the section that says any post-termination increase in assets of a plan is credited to PBGC. Well, certainly that's true. The PBGC is the trustee. It holds title to the assets. That's the nature of a trust. But that does not mean that the PBGC gets to appropriate those assets for some other purpose other than providing benefits to the participants in the plan for which the recovery was made. Now, the analysis starts with Section 4061 of ERISA, which is 29 U.S.C. 1361. And that's the section that describes amounts payable by the corporation, the corporation, of course, being PBGC. And Section 4061 says that the corporation shall pay benefits under a terminated single employer plan, which is what we have here, subject to the limitations and requirements set forth elsewhere in Part B. And it says that amounts that are guaranteed by the corporation shall be paid by the corporation only out of the appropriate fund. Okay. The next relevant section is Section 4022, which is 29 U.S.C. Section 1322. And this is the section that the Wilmington Shipping Court pointed to repeatedly. And this is the section that's entitled Single Employer Plan Benefits Guaranteed. And it describes all the different types of benefits that will be paid by PBGC. The subdivision C of that section says that for plans with over $20 million in benefits liabilities, which is what this plan is, PBGC estimated its benefit obligation determination as $504 million in benefit liabilities, so we're far in excess of the $20 million. PBGC must pay non-guaranteed benefits in accordance with the priority allocation that is set forth in Section 4044 that's been cited in this case. PBGC is to pay non-guaranteed benefits in the proportion that its recovery with respect to the plan bears to the outstanding benefits liabilities of the plan. Okay? PBGC uses its recoveries on behalf of the plan to pay the outstanding benefits liabilities under the plan. Well, is that, in your view then, you know, a lot of the argument in the briefing has to do with the discretionary nature of this and the fact that there may not be an as-whole recovery. And, of course, it depends on what would pass through in a lawsuit. Is it your view that the Pension Benefit Guarantee Corporation has any discretion with respect to the distribution once it's in possession of monies as a result of a lawsuit, or is it statutorily mandated to take certain action? It's statutorily mandated. Section 4022 says that PBGC shall pay these benefits. PBGC gets to make the determination of what's called the applicable recovery ratio. And the recovery ratio for plans of this size is the proportion of the recoveries with respect to the plan to the outstanding benefits liabilities. And certainly that's a determination that is committed by PBGC. That's kind of the waystation of discretion here, correct? Well, it doesn't say it's a discretionary determination, but it does say that PBGC gets to make the determination what is the recovery ratio. So what is the proportion of the recovery to the benefits plan liabilities? And that includes, among other things, determining what the plan's liabilities are. Well, the PBGC also gets the discretion on whether to pursue certain claims, like the one against the actuarial and that sort of thing, right? Yes, that's correct. What's your best case to show that an individual claimholder here under the risk policy has a right to proceed, has a standing to proceed, instead of PBGC? The best case would be... Well, instead of PBGC, there's no case that I'm aware of that says a plan participant has a superior right to PBGC to proceed. Wilmington shipping is the best case for the proposition that a participant has a right to proceed, has Article III standing to proceed, because even after a plan has been taken over by PBGC, a loss of benefits to the participant is a redressable injury.  that we have a superior right to proceed, but the fact of the matter is that the statute of limitations on PBGC's claims has lapsed. So there's not an opportunity at this point for PBGC to proceed against the actuary. But why doesn't the whole ERISA scheme presuppose that PBGC would be the one to make those decisions relative to all of the people, as opposed to you coming here for a handful of the people? Well, two responses, Your Honor. First of all, ERISA specifically provides that participants have, on the ERISA claims, that participants have the right to proceed on behalf of the plan against a breaching fiduciary. And there's nothing in ERISA, and the Wilmington Shipping Corp addressed this, to indicate that that right somehow goes away when a plan is terminated. Secondly... You're talking now about a statutory right. That's correct. The statutory right to bring the claim under section... I think that, just so you know, and I don't pretend to speak for the panel, but one of the things that comes clear is that everyone agrees that there is a statutory right set out. The concern, I think, has to do with more of a prudential and constitutional standing vis-à-vis the guarantee corporation. So it's not that there isn't a statutory right that could be exercised in some circumstances, but the question is, is there constitutional standing? There is constitutional standing, as the Wilmington Shipping Corp held. I'd like to go back to the issue that you raised about coming here for a handful of plan participants. Well, yeah, I guess that kind of maybe you can address this, because I see a little conflict in your approach in that I think regarding Claims 1, 3, and 4, appellants have requested that the fiduciary defendants make good to the CFC plan under ERISA Section 409A. And if you look at the Fourth Amendment complaint at 415 to 17, paragraph D, that can you confirm then, assuming standing and a recovery, appellants intend to request a relief to go to the CFC plan and not to individual appellants? What the complaint pleads is that loss be made good to the plan. That is the recovery that's provided for under Section 409 of ERISA. The complaint also pleads that the request that the assets that are recovered be allocated to a successor trust for the benefit of those participants, and that would be plaintiffs and the class that they seek to represent. So those people here? No, plaintiffs and the class. But you don't have a class certified. That never has happened, correct? No, there has never been a class certification, but the plaintiffs are seeking to represent all participants whose benefits have been reduced as a result of the termination of the plan, which was going to be my response to your point. That's not all the people in the plan though, right? It's like 8% or something like that? Correct. It was originally estimated by CFC that the number of affected participants would be 8%. PBGC has stated in its answer in the district court, estimated that there are 150 participants whose pensions have been reduced. And plaintiffs are speaking to proceed on behalf of all of those participants. So the complaint is that to return to the relief, the complaint pleads that the plan be made whole and that the assets to make the plan whole as a separate prayer that the assets be allocated to a successor trust for the benefit of participants whose pensions have been reduced. And to make a cut to the chase on making the plan whole, is that in the nature and effect of damages? I mean, it's money, correct? Yes, it's the monetary relief that's specifically provided. It's a dollar monetary relief. That's correct. Yes, it's the monetary relief that's specifically provided for under Section 502A2 and 409 of ERISA. Okay. I'd like to address a couple of issues pertaining to standing with respect to the state law claims because the constitutional standing issue actually was only raised in the district court with respect to the state law claims and not with respect to the ERISA claims. On the state law claims, if the plaintiffs succeed in proving that Towers Perrin owed them a duty, which is an issue on this appeal, that Towers Perrin breached that duty to them and that they were harmed as a result, then there will be a tort recovery, there will be a judgment for plaintiffs. And there is no mechanism under state or federal law where that tort recovery by plaintiffs would go to PBGC. So the notion that plaintiffs lack constitutional standing because a remedy on their state law claims would be paid to PBGC doesn't... There's no mechanism by which that could occur. So plaintiffs clearly have constitutional standing to pursue their state law claims. So unless for some reason there were conflict preemption, then that would just be created like a regular tort claim, you're saying? That's correct. That's right. If these are non-preemptive claims, there are normal tort damages if the claim's approved. Well, is it... I don't know how to pronounce it. Is it Bylie that you said? Yes. Setting aside footnote 16 from Bylie, were the court to find that Towers Perrin owed an ordinary duty of care directly to planned participants under California law, isn't there a very real possibility that such a precedent could severely diminish the availability of actuarial services to ERISA plans or make those services prohibitively expensive? No, not at all. Is that enough to deter the court from finding a duty, notwithstanding the absence of Bylie's two other policy points that they say it concerns? No, not at all. It's an insurable risk and a foreseeable risk and one that actuaries already insure against. Actuaries do, from time to time, get sued for professional malpractice in connection with services that they provide to ERISA plans, and we've cited those cases, some of them, in the brief. Jerosa v. Sevasta out of the Second Circuit is an example. That is a risk that already exists, a liability that already exists. Well, I understand this is 12b-6, and so you haven't really been able to conduct discovery, but I think one of your plaintiffs was a COO or was someone that was fairly high up in management, and I noticed there's, like, been four amended complaints and the like, and I see an absence of, you know, this. I don't see in your complaints anything about that there's the cooking of the books between the actuarial and the companies. Is that because you can't allege that or because it's a discovery issue or what? I'm really not sure what you mean by a cooking. So you're really not looking to say that the companies or the committee defendants or whatever that you're trying to prove that they told the actuarial to, you know, come up with a way so that for five years you don't have to put $216 million in here? There's no...no. The allegation is that the actuarial assumptions that were used to value the liabilities and assets of the plan were unreasonable and that the fiduciaries either failed to provide information to the actuaries or failed to properly supervise... So your opinion is on the reasonable determination, and you're saying that can't be determined at 12b-6? The allegation in the complaint is that the actuarial assumptions were unreasonable. The expected retirement age was too high and the interest rate, the anticipated rate of return on the plan's investments was too low. So therefore, both the liabilities were understated and the assets were overstated. But the role in terms of linking that up to the committee defendants, it's abrogation on their part, in your view, to oversee this arrangement, is that...? Yes, that's exactly right, because under Ninth Circuit law, the fiduciaries of the plan don't have a right to simply rely without question on the opinions of experts. And that's the Howard v. Shea case, and that's a rule that's followed around the country. The fiduciaries have an obligation to question the assumptions that are made by experts with respect to the plan's assets and liabilities. In Howard v. Shea, it happens to be the opinion of an appraiser. It also was a little bit confusing in some of the early multiple complaints. Is the only fiduciary breach that you're alleging one that took place after the spin-out? No, there are two fiduciary breach claims. One pertains to the spin-off, the valuation of the assets and liabilities after spin-off. And what's your best support for that being a basis for a fiduciary claim? The best support for that being the basis for a fiduciary claim, I think, would be Waller v. Blue Cross and Blue Shield, out of the Ninth Circuit, which is the case that states that while the decision to terminate a plan, to establish a plan, to amend a plan is a set or a function, the implementation of that decision is a fiduciary function. So in Waller, the implementation involves the selection of an annuity provider to pay benefits under a terminated plan. While the decision to terminate the plan is not a fiduciary decision, the implementation of that decision, the selection of the annuity provider, is a fiduciary function. In this case, the decision to spin-off the plan by CNF and the decision by CFC to establish the new plan, those are not fiduciary decisions. But the implementation of those decisions, in this case the selection of actuarial assumptions to value the assets and liabilities after spin-off... That's a little bit different, too, because what you're saying is that their choice of the actuary, or are you simply saying we're back to failure to supervise or failure to provide appropriate information? It seems to me you're circling around what is the actual claim. Right. The complaint alleges both. The failure to supervise, the failure to provide appropriate information, and then the failure to ensure that the actuarial assumptions were reasonable. How is it that CNF owed a fiduciary duty to CFC plan participants post-spin-off? Through its control over the plan's administrator, the plan's third-party administrator, which was CNF Services. You also claim the committee defendants owed a fiduciary duty to CNF plan participants pre-spin-off, right? That's correct. I mean, they were CNF plan participants at the time of the spin-off. For example, the retirees, who were already in paid status on their pensions, retired from CNF but were transferred to the CFC plan. They owed a fiduciary duty. Well, the decision to transfer these participants was not taken in a fiduciary capacity. The fiduciaries did owe a duty to ensure that the implementation of that decision was undertaken consistent with their fiduciary duties. I'd like to reserve the remainder of my time, unless you have further questions. Please do. Thank you. Yes, good morning, Your Honors. I'm Robert Mangels. As I indicated, I'm going to address a single claim, if you will, against Towers-Perrin, which is for negligence. It's not a claim for ERISA and all these other issues. It's for negligence. As we know, the court below found that the plaintiffs have no claim under California law for negligence, citing both Biley v. Arthur Young and the Glenn Jackson case in this circuit. In a reprieve filed by the appellants, they've raised one new argument they'd like to address, which is the Nutmeg Securities arguments. They contend that a case called Nutmeg Securities v. McGladrey Pullum somehow undermines the district court's decision in reliance on Biley. That is incorrect. The Nutmeg case dealt with a situation involving negligent misrepresentation, and there's no doubt about that. As expressly talked about in the Nutmeg case, in footnote number one, they say, Biley dealt with simple negligence. Biley did not deal with negligent misrepresentation. So the holding in Nutmeg Securities does not apply in any way to this case because it dealt with a negligent misrepresentation situation. The reason that is important is because plaintiffs cannot, appellants cannot show negligent misrepresentation here. It's a separate tort, which, as we know, requires reliance. I have trouble here with the facts in the sense you've got a company that's in trouble that they decide that they're going to spin off, and they retain your client to assist in this. And so they already, and for five years, the actuarial just files these reports saying you don't have to put any money in. And then it ends up, voila, $216 million short. Now, who, I guess, first off, because there's no discovery, and this is 12B-6, which entity or individuals actually retain Towers-Perrin to provide services to the CNF plan and CFC plan, respectively? Well, the plan is the entity that contracts with Towers-Perrin, Your Honor. Obviously, the beneficiaries had no contract, no relationship at all. Well, but how do we, we haven't even seen the contract because there's no discovery, right? So how do we really know that? I believe, and I don't have it in front of me, but the allegations of the plan would say that the plan did hire Towers-Perrin. Actually, the interesting thing, as we know from the record, is the plaintiffs, in this case, Mr. Paulson and others, were the senior officers of the company. So there's no record that would show that this company was in deep trouble when this spinoff occurred. In fact, these plaintiffs would be hard to say that because, at the time, they did not make any such statements in the public. Well, I suspect maybe that's why this doesn't present itself as a situation that there's sort of this conspiratorial, you know, sort of Arthur Anderson Enron type of situation because you do have high-up people that are involved. But I guess my question would be, is there no possibility that, based on the complaint, the talents fit within Biley's exception for third-party intended beneficiaries? And how can the court, how can we even determine whether that exception applies without reviewing the Towers-Perrin engagement contract? And I guess, at the very least, why shouldn't appellants be allowed to seek discovery into whether the planned participants were intended third-party beneficiaries of the Towers-Perrin engagement agreement given that the third-party beneficiary exception is already established under Biley? And that's where I'm kind of... As to the third-party beneficiary exception, both in Biley and also in other cases beside it, Outdoor Services, Inc., the actuary is in a contract with the plan to provide actuarial services. There is no allegation in the complaint, through four complaints, if I recall, or five complaints, that there was any intention that the contract between Towers-Perrin and the plan was intended to benefit those people. And that's why the difference is, in the negligent misrepresentation case, such as Nutmeg, you have to show reliance. They have said, the members of this plan, in their allegations and the complaint, never read the statements, don't have any knowledge about the statements. So they cannot show reliance, and they cannot show from the record and from the complaints, five of which were filed, that the contract between Towers-Perrin to do actuarial services intended to benefit these individuals. Why isn't that a factual issue? Pardon me, Your Honor? Why isn't the third-party beneficiary issue a factual issue, given where we are in the proceedings? I would say, Your Honor, first of all, you have a situation where the president of the company was there, and the other senior executives of the company, their plaintiffs, were there. They would have some idea if they were the intended beneficiaries of this contract. And through five complaints, they've never made such an allegation, Your Honor. For them now to say they're the intended beneficiary, I say is contrary to three years of history in this case, and contrary to the logic, the senior executives of the company would know the facts. That might be true, but that's a lot of facts to get to the end analysis. If you really go back, you're saying, let me just see if I understand you correctly, you're saying that nowhere in any of these multiple complaints is there an allegation of the plan beneficiaries as being potential third-party beneficiaries of the actuarial contract. There's no allegations that these individuals were the intended beneficiaries of the contract of the services that Towers Parent provided to the plan. That's the kind of common sense, isn't it? Yes, Your Honor. I mean, it's common sense that they would be the beneficiaries because they're going to be the retirees under the plan. They're beneficiaries in one sense, Your Honor, but they're not beneficiaries of the services. What an actuary does, it gets to a question asked by one of the panel members, what an actuary does under ERISA is perform services for the plan. It does all these calculations, it files statements with the IRS and the like. But the plan is for the ultimate retirees or you wouldn't even have a plan, right? They might be indirect beneficiaries, Your Honor, but they're not direct beneficiaries of the service that we're providing. But just because they filed the report according to the IRS, how do you know that that was reasonable? Well, we know a couple of things just from the record. We know that the PBGC, after they took over the plan, looked twice at the Towers-Perrin work and made a finding that they didn't find any problems with the work, and that is in the record in this case. So the PBGC took a look at it. Getting back to another question the panel asked, the PBGC has as an asset any chosen action against Towers-Perrin once they take over this plan. They looked at it. They chose twice not to pursue such a cause of action, finding that the work done by Towers-Perrin was satisfactory. So once they find that is the case, I think that's some evidence, strong evidence, that the work done by Towers-Perrin was correct. So I think we can rely upon that to draw that conclusion because the actuary is answering to a lot of people. It's answering primarily, though, to the ERISA obligations, and in this case the PBGC looked at what they did and found what they did was satisfactory. But, okay, it's 12B-6, and we still have a plan that comes up $216 million short, and over five years the actuarials, they say you don't have to put any money in it. So defendants I know say, well, the economy took a downward spin, and that's what all the problems are. But there was obviously already a problem going into this when the spinoff was created. I don't think we can say for sure from the record. There's no evidence that that was the case. Again, returning to the fact that senior executives were there at the time the spinoff occurred, their allegation is everybody knew all along this wasn't going to work. Well, the people that knew all along were the senior executives that set this whole thing in motion. Well, maybe they lose their case, but the question is we don't know that now. We take a representation, well, they knew all along, or they should have known, or they were there at the table and should have tumbled to the fact that there was going to be a problem. We do know, Your Honor. That's factual, though. We do know the owner of the claim against Towers-Perrin, which is the PBGC in the terminated plan, because it is an asset of the plan. Correct. They chose twice not to pursue Towers-Perrin. Okay, let's stop there. Does the fact that they chose not to pursue Towers-Perrin, how does that answer the question of whether or not there could be a cause of action that would go forward after a 12 v. 6 by the plaintiffs here? I guess there's two responses to that, Your Honor. There's one, the argument we're having right now about Biley and these cases. The second is remedies preemption, which I'm going to leave to other counsel to argue. But remedies preemption, I would suggest, would say, as the judge below said, would preclude any such cause of action because the remedies they're seeking is a remedy that is within the confines of the PBGC. I do not want to get into that area, Your Honor, so I won't at this point in time. The second new point raised by counsel for the first time in their reply in this case was on page 5 and 6 of their brief, and it has three problems with it. One is raised for the first time, which is the so-called consequential damages argument. They're saying there might be, even if they can't get the benefits they think they're entitled to under the law, there's consequential damages which are separate and distinct from that, and they're trying to get away from this whole PBGC issue there. As I say, first, it's been raised for the first time in an appeal, and under a number of cases in this circuit, Spurlock v. FBI, it should be disregarded. The second is it's entirely contrary to the factual record in this case. The PBGC has said on three occasions, more occasions, but at least three, in this case, all they're seeking is the difference between the promised benefits and what they got. That's in the Fourth Amendment complaint, paragraph 116. In the district court, when they were asked what are their damages, they say the amount would be measured by the difference between what they should have been able to get and what they're getting now, and that's the record, 365-366. In their opening brief in this court, in saying why biling is not a big problem here in expanding the remedies, they say the only remedy they're seeking is the difference between the value between the pensions they received and the benefits they actually did receive. So they've taken that clear position. Now they're saying there's different damages they're entitled to now in their reply brief, which is these so-called consequential damages. So for all those reasons, they should not be able to pursue their argument, but more importantly, they're wrong as a matter of law, and that's based upon the Clegg-Horne v. Blue Shield case. In that case, it would be subject to maybe some other discussion. But in Clegg-Horne, in addition to the benefits that were being sought in that case, the state law claims included punitive damages. And in that case, the addition of punitive damages... Is there accountable care that you're taking up their time? No, Your Honor. I will submit. Thank you very much. May it please the Court. I'm Gary Tell on behalf of the individual defendants, Robert Reisman, James Teener, Stephen Richardson, the Administrative Committee of the Consolidated Freightways Pension Plan. As we presaged earlier, I'm not going to cover the waterfront. I'm going to focus on constitutional standing, and if time permits, touch on a few of the other committee defendants' major arguments. And as the panel indicated earlier, the heart of this is redressability. Is it likely, rather than speculative, that an alleged injury will be redressed by a favorable decision? Well, but even if it... Let's just say that if you get over even... I'll take you back to that. But assuming appellants have standing on their adequate funding plan claim, how can the Court assess the reasonableness of any funding plan on a motion to dismiss? So I'm just wondering, even if you win... Well, I mean, if you don't win at the first one, I mean, I still don't see how we could assess reasonableness. Standing is a threshold issue. We'll come back to that. Okay. With regard to the claims against my clients, there are four, two of which relate to the spinoff. One is this supervision of the actuaries in connection to the spinoff. The other is distributing summary plan descriptions, which is a regulatory requirement. It has to be done within 90 days. In that case, there was a new pension plan formed, the CSD plan, and SPDs would need to be distributed. Those are just time-barred under ERISA's six-year statute of limitations, Section 41329 U.S.C. 1113. Moreover, there are causation issues with respect to those claims. With regard to Claim 3, which is the claim that the administrative committee failed to supervise or failed to provide information to the enrolled actuaries, there is a complete answer here in the Ninth Circuit's own authority, the Citrus Valley case. Enrolled actuaries are different than other service providers. First of all, they are providing a service essentially to the employer because it is the plan sponsor or the employer that has responsibility to fund the plan. The purpose of the administrative committee and these individual defendants principally is to oversee the investment of the plan's assets, to supervise investment managers, or to pay claims. And in the Citrus Valley case, the court points out that seeking to affect the judgments, the assumptions of the enrolled actuary can have very adverse tax consequences for the FISC because those assumptions could cause the employer to fund the plan very richly and take large deductions or cause the employer to fund the plan not at all. Fundamentally, the role of a committee here is to function as an investment fiduciary and to pay claims. That's the key. Okay. If you want to go back to your... Yeah, I want to finish this up though. You know, what you're saying, it's one thing to jigger the investment assumptions and to interfere with the actuarial process because that, of course, would violate both the actuary duty and your client's duty. But the question here is a little bit different. It's having come up with these figures and having issued the report, is it your position that your client has no fiduciary duty to take a look at that? And if there are problems, obvious problems, or inquiries that should be made, they don't have to do anything? All I do is pay the money. I mean, that's how you made your client sound. We're the checkbook. And bear in mind, it's the employer's responsibility to pay the money, not the fiduciary's who are being targeted in this lawsuit. But what's crucial here is what the complaint pleads in the record ER-394, the failing to supervise, to monitor, and to investigate the basis for which Towers-Perrin's annual valuations of the accumulated funding benefit obligations to the CSB plan were handled. That is flatly inconsistent with this circuit's precedent in Citrus Valley. Further, to provide adequate information about the CFC plan, the participants, and CFC to enable Towers-Perrin to formulate reasonable obligations. That provides absolutely no factual basis. Even if we were to assume it's true to show that there's a breach of duty, that is extremely vague and, as a consequence, shouldn't pass muster at the 12 to 6 stage. They're saying from Citrus Valley there's no duty on the part of the committee to supervise the actuarial. Is that what you're saying? More precisely, the assumptions of the actuary here, the most specific allegations in the complaint relate to the interest rate assumption and the choice of a retirement agent. Mechanics of doing the actuarial calculations is what are being challenged, in other words. Those calculations are being challenged based on those assumptions, and certainly Congress, in requiring actuaries to be enrolled, meant for this to be a serious professional role, and that's what the plan and the company did. They hired a reputable actuarial firm to conduct that role. To have a committee like this of laymen second-guess these assumptions creates an impossible duty, and that's just not the law. Do you want to address the standing? Certainly. The key here is redressability. For there to be redressability, this lawsuit must yield some tangible benefit to the plaintiffs, and it cannot be speculative. Here it is speculative because the PBGC's process requires the PBGC to marshal the assets, value them, which is critical here, which requires judgment, particularly a lawsuit. They have to value this lawsuit to determine the participants' benefits because the PBGC values the assets as of the termination date, retroactively. After the termination date, Section 4044C of ERISA indicates that all gains are credited to the PBGC and all losses are suffered by the PBGC. Certainly, valuing claims, valuing assets requires judgment, and it's not just speculative because of that. It's also speculative because once assets come in, the PBGC determines the degree of underfunding and then deploys the six-tier priority structure that we've alluded to earlier this morning. All of these factors make it exceedingly speculative that the plaintiffs here will see a penny as a result of this lawsuit. If I can touch on just one more issue, it's the principle that it's possible for the fiduciaries of the CFC plan to have some fiduciary role with regard to the spinoff. That's just flatly inconsistent with the law. There was no plan. The spinoff created a plan. At that point, the fiduciaries are installed on the second plan, the CFC plan, and it was CNF, not the administrative committee that made the decision to engage in the spinoff. It was CNF, not the administrative committee. Let's talk in real terms. Let's say that some claim got to court and it was determined that there were $250 million, including interest, that are basically underfunded, owed to the plan, et cetera. That goes to PNGC, right? That goes to the Guarantee Corporation. And the PBGC must step up and guarantee benefits. Yes. And that comes into its coffers on behalf of the plan. And it then goes through a process, correct, to determine what to do with that? Correct. And under its statute, it pools not the assets of all the plans under the auspices of the PBGC, not just this particular plan, all of the assets that are taken in, either through recoveries or through investment earnings, are pooled. And you're saying that now that we have this money in the big pool, that there's no statutory obligation that it would go out pro rata or otherwise to the individuals who brought the lawsuit. Is that correct? My point is that – Is that correct or not? I think that is correct, depending on how the PBGC values the claim and the economics of the plans underfunding and the application of that priority screen. My point is that it's speculative, and that's enough under Lujan to destroy redressability. Can you say with certainty that absolutely none of it would go to any plan beneficiary if there were a court order that it had been underfunded, that there were liabilities, and that this amount of money should be paid out by one or more of the defendants? You're saying – you can say with absolute certainty that none of it would go? In this case, Your Honor? Yes. I can't say that on this record. But what I can say is because the plaintiffs are seeking non-guaranteed benefits, which are at the bottom of the PBGC's priority screen, it's highly unlikely, it's speculative whether they will receive a penny from this lawsuit. Okay.  Thank you, Your Honor. Thank you. Good morning, Your Honor. I'm David Bacon, appearing for the CNF defendants. I'd like to begin by pointing out that CNF has some unique standing arguments that are totally independent of the other standing arguments that are being made. Under ERISA, the plan participant only has standing to sue the fiduciary of a plan to which he or she is a participant, and there's no standing to sue the fiduciary of a plan to which he or she is not a participant. CNF was not a fiduciary to the spun-off CFC plan, nor was the service company CNFSC, and there are no allegations of fact, which would even remotely support the conclusion that there was a fiduciary obligation there between either CNF or CNFSC and the CFC plan. So there's a complete lack of standing in addition to a lack of remedy and in addition to a lack of damages. I'd like to move on very quickly to the issue of implementation of a spin-off. When Congress framed Section 208 of ERISA, which allows a spin-off of pension plan and assets, it very carefully put that section not in the fiduciary responsibility provisions but rather in the section dealing with funding and vesting, and I think the reason is fairly simple. It's one of the most basic rules of trust law, and I think it goes back to the Bible that a servant cannot serve two masters. When Congress did not want to put an employer which is spinning off a pension plan in the situation of being a fiduciary to its own participants and also a fiduciary to the participants in a newly spun-off plan, how would the employer adjust those competing interests? It really wouldn't work. And what Congress did instead I think was quite fair and proper, and certainly was within Congress's purview. It required that the calculation of how much was to be spun off in terms of assets and liabilities be done by an independent enrolled actuary, and the test for the propriety of the calculation does not involve fiduciary duties. Instead, the independent enrolled actuary is governed by the national actuarial standards, the standards of the- Actuary, is that for the people like the appellants to make sure that they're protected? I'm sorry, are you asking- Why do you hire an actuary? You're saying that Congress didn't want companies to be in a position where they would be conflicted in the spin-off, so the actuary is the one that's supposed to take care of the people like the appellant, right? To calculate the correct amount of assets to be spun off to cover the accrued benefits at the time of the spin-off, actuarial science comes into play. So why wouldn't that give them an argument for being third-party beneficiaries? Why does that give them an argument? Why wouldn't that give them an argument? Because you're saying that's why you hire an actuary is to make sure that those people are protected and that this is done independently and- There's no-first of all, you have to hire an enrolled actuary. The actuary makes the calculation. The Ninth Circuit and two other circuits have addressed this very issue, although not in the spin-off context, in the Citrus Valley Estates case, and the courts are all in agreement that Congress did not want the employer interfering with the actuary's independent judgment. The problem would be the employer is going to be pushing the scale down one way and the actuary is going to be pushing it up the other, but Congress did not want an employer firing actuary after actuary until it found someone who was willing to accept the employer's assumptions. And so the courts have adopted a procedural test here, and in essence the actuarial assumptions and the actuarial calculations will be upheld unless there's proof that the employer improperly intervened and interfered. There's no allegation of that here. In fact, the allegations here are exactly the opposite. The two assumptions that plaintiffs contest are facially reasonable. The first assumption is the interest rate assumption, and the evidence shows, the record shows, that the interest rate assumption chosen by the actuary was, in fact, less than the Moody's trip, Moosey's and Bond. Stop, stop. That's not an issue for the appellate court. I mean, right there, if we've got to go there, then we've got to have a trial, because we're not here to figure out whether it was less or more or reasonable. If that's the case, then that's something that would go to trial. That's not something that would be determined on appeal or on the 12B6. Maybe to get to the point of what, from a legal issue standpoint, you've made the one point with respect to your client that they're not a fiduciary to the spun-out plan. That's CNF, correct? So what is your other legal point? The two assumptions were challenged. Both were reasonable on their face, all right? And both were twice approved by the PBGC. But you know what? You can keep saying all that, but it doesn't help me decide this case at this stage. What that indicates to me is that the implementational argument that Plaintiff is trying to make collapses of its own weight. Because it's reasonable, right? Pardon? Because the assumptions were reasonable. I'm sorry, I'm not understanding. Why does it collapse of its own weight? Because the assumptions were reasonable. Because I think if assumptions were reasonable on their own face, and they've been twice approved. Okay, well, we're talking past each other. I'm just saying that they may or may not be reasonable. I have no idea. But that's not something that's going to be determined on appeal. If your argument is predicated on facial reasonableness, which really is a factual issue, then that's going to be a losing argument. Well, I think if you have – let me make the point slightly differently and then move on. I apologize for wasting your time. No, you're not wasting your time. I'm just trying to clue you in that, you know, everybody here keeps talking about reasonableness and this and that, and we're saying if you get there, you lose us on appeal. My point is that if an assumption appears reasonable on his face and has been twice approved by the PBGC as a matter of law, it's fine. What's at issue is whether as a matter of law Judge Weare's finding can be supported, and it can. I'm out of time. Thank you. All right. You're from the PBGC, I believe. Everybody keeps talking about you, and now you get to talk about yourself. That's what I fear. Your Honors, my name is Charles Finke, and I'm Deputy Chief Counsel at the Pension Benefit Guarantee Corporation. The PBGC is a federal agency that is involved in this lawsuit for the sole reason that PBGC did not sue the fiduciary defendants and Towers' parents. Well, now, Towers' parents think the fact that you didn't sue them, that it's almost like it's race judicata or some sort of finding the fact that they did nothing wrong. Does that, the fact that you made a decision not to sue them, does that end our inquiry? I don't think it's quite as simple as they're saying, but. I think what we've decided to do or not to do in the case has relevance, but I don't think it's determinative of whether, you know, at the 12B6 stage, the case is over. Here, for PBGC, we are a governmental entity that the district court correctly noted is given the discretion in Title IV of ERISA to bring a suit for alleged wrongs involving a terminated plan, but is not mandated to do so. This case against PBGC was correctly dismissed for the reason that our considered abstention in not bringing or joining suit here is presumptively unreviewable under Heckler v. Cheney and its progeny. Our brief explains the circumstances that show that this is exactly the kind of situation that Heckler was talking about. It's a complicated balancing of a number of factors that are peculiarly within PBGC's expertise. In its reply brief, the appellants asserted that Heckler can be distinguished because it concerns an APA review and that none of the cases PBGC cited were about PBGC or ERISA. The circuit court rejected a very similar argument in a 2001 case, Sierra Club v. Whitman, which can be found at 268 F3rd 898. There, this court said that the traditional presumption that an agency's refusal to investigate or enforce is within the agency's discretion, citing Heckler. The panel noted that the presumption of agency discretion recognized in Cheney has a very long history, and contrary to the plaintiff's assertions there, the Sierra Club's assertions there, it's not limited to cases brought under the APA and that, in fact, in setting out the presumption in Heckler v. Cheney, the Supreme Court relied on four prior cases, none of which were APA cases, and in fact that what Heckler v. Cheney was doing was extending to the APA area the traditional rule of unreviewability of agency inaction. Well, let's just say if we were, you know, obviously you don't want carve-outs, because if there were carve-outs, then that means, you know, anyone that thinks that they could get a better lawyer to make a better claim for their particular client then would be able to interfere with your ability to do what you think you need to do for everyone, right? Yes, to a degree. I mean, to the extent that it got in the way of the remedial scheme that's set up in Title IV. Well, what type of considerations? I mean, you could decide you don't want to pursue something maybe because you don't think that it might benefit a few people, but it wouldn't benefit a larger number of people, or what? Well, yeah, I mean, PBGC has three statutory missions. One is to encourage the continuation and maintenance of ongoing private pension plans. The second is the payment of uninterrupted benefits, and the third is to keep the premiums, which is what funds PBGC, paid by plan sponsors as low as possible. So we have statutory obligations to the plaintiffs here, but also to all of the participants in the CFC plan, to all the participants in all terminated plans, and, in fact, to the participants and plan sponsors in ongoing plans. And to employers because we want to have employers keep doing this, right? Exactly, exactly. And so we have all of those statutory considerations to consider, which is exactly the complicated balancing of numerous factors that Heckler talked about. You don't have, like, the very few cases where someone's been permitted to sue a government agency for failure to sue have involved some identifiable mandatory duty. Exactly. Is there any statute for your statute that involves one of those? No. I mean, it's a rebuttable. The presumption of unreviewability is just that, a presumption, and the Supreme Court has said it can be rebutted where Congress has mandated action. So if there was something that said the PBGC shall, that would be a different issue. Instead, what 1342 of Title IV says is PBGC has the authority to bring such actions. It does not in any way mandate actions. It's completely a discretionary action. So inaction in that circumstance is exactly the kind of situation that Heckler and this court in this Yerko versus Whitman case were talking about. Let me ask you a different question, and you can tell me whether you can answer it or not. It's not really directly pertinent to whether or not you should have sued or not sued, which is the question you've just addressed and is really the target of your client in the litigation. But it's really a separate issue which doesn't have so much to do with your liability but goes back to the redressability, and they keep mentioning what would happen. If there were a pot of money that the court awarded to the plaintiffs, can you tell us on behalf of the PBGC what would be the flow of that money and what would happen to it? It isn't, and I hate to say this, it isn't completely clear, especially on the factual development of the case so far in the complaint. But basically what happens is PBGC, in order to participants get paid their guaranteed benefit and then they can get paid some additional shares of the recovery that plaintiffs' counsel described, and that's based on ratios that include the plan's underfunding, how much the plan was underfunded. Well, to determine how much the plan is underfunded, we have to determine how much assets are in the plan. And so what we have to do when we take in the plan is look at all the plan's assets, and some of them are very hard to value. The plan may hold real estate that may or may not have environmental problems, all of those sorts of things. We have to come up with a value. The plan may hold the potential of litigation recoveries or the potential of bringing litigation to seek recoveries. In order to make the statutory framework work, we have to value those assets at that time. Then under 1344C that you've heard about, gains or losses on the assets once valued are suffered by the PBGC or to the PBGC's benefit. So it would, if there was a recovery, say in this case, three years down the road, if the case went back or something, we would look at, PBGC had to value the assets before three years from now in the future, so we would look at how PBGC valued the assets. And plaintiffs or participants may have shared in those assets based on that valuation. We may have valued it at, I mean, it's not in the record. We may have valued it at zero. We may have valued it at some real dollar amount. If we value it at a real dollar amount and down the road there's a defendant's verdict in the case, then the loss in assets is borne by PBGC. If, on the other hand, say we value the lawsuit at zero and there is a recovery in the lawsuit, that would be a gain on assets. All right. Well, I guess on the issue of Article III standing, right, that, all right, appellants are in a position where if they don't have Article III standing, a lot of this goes away as far as that goes. But, and part of the reason that defendants or respondents, appellees are arguing that they don't have Article III standing is because they're saying they're just trying to get it for themselves. They're not trying to get it for everyone. But involved in that, because this is 12B6, they never have an opportunity to try to certify a class to say that they're, you know, that they're representing. But then I guess even at best the class would be 8%, not 100%. Well, the complaints allegations, I think, refer to 8%. We have now completed the valuation. We now know how many people it would entail. That's not part of the record. Let me ask you just a little different question then, is the valuation, the losses, the gains, et cetera, and all that, does that revolve solely around this plan or is it in a larger pool of PBGC assets? PBGC took the... Pooled for purposes of... Right, right. PBGC took the assets of this plan. We also filed claims in the CSE bankruptcy that we got recoveries on. Those recoveries become part of the assets that are shared with the plaintiffs. We take all of those monies, we pool them with all of the assets and the recoveries of other plans, and under 1342A we use those to pay benefits of the CSE plan and all other terminated plans, and in accordance with the statute for all other purposes deemed appropriate by PBGC and the administration of Title IV. Let me just stop you there. Just to be clear then, there's not, in effect, a one-to-one correlation between recoveries on behalf of a plan and payouts because it all goes into the larger pool and then a larger determination? Is that correct? Yeah. What I think is helpful to think about is you sort of separate the benefit from the assets after termination in the sense that we still, in an accounting way, value the assets associated with the CSE plan, and the value of those assets gets used for purposes of the asset allocation that is described in 1344A where you have these six buckets and, you know, the assets go towards guaranteed benefits before they go towards the non-guaranteed benefits. They also, those assets, those recoveries on those assets get valued in 1322C, which says that under this recovery ratio we share part of our recovery on the underfunding with the participants. So, in other words, in the bankruptcy, we had a claim for the 200 and some odd million dollars of underfunding in the plan. We got paid, if I remember right, something approaching $24 or $5 million on that claim. So, that became recoveries, a ratio of our recovery versus the overall underfunding got shared. That happens despite the fact that all of the assets have, in fact, been pooled together in a large fund that the PBGC uses for both the payment of benefits and its other administrative operations. Okay, thank you. I appreciate the clarification. We have some, I believe Ms. Riker had some rebuttal time. Thank you, Your Honor. I think the key point here on the Article III standing is that these participants have vested rights to a contractually defined level of benefits. The termination of the plan doesn't take those rights away. PBGC only has a responsibility to satisfy those obligations up to certain levels and in a certain priority order, as we've already discussed. But the vested rights to a contractually defined level of benefits still exist. And the plaintiffs have suffered an injury because they are not receiving their contractually defined level of benefits. Now, when we talk about the Article III standing cases, there's really three cases that are significant here. And one is Wilmington Shipping, which we've talked about, where that is exactly, it's on all fours with this case. It's exactly the same situation. The participant has suffered a loss, an injury to his contractually defined benefits. How does that particular case, though I asked you this previously, was PBGC involved in Wilmington? Yes, it was. It's exactly the same situation. The plan was underfunded, and it was terminated and taken over by PBGC, and PBGC paid guaranteed benefits. So it's exactly the same situation. But the participant had Article III standing because he had suffered an injury to his vested right to a contractually defined level of benefits, and that injury could be redressed by the lawsuit because if the plan were made whole for its losses, he could receive an additional benefit, the right to a lump sum payment. The other cases that have been cited by the defendants that are pertinent here and important to distinguish are Glanton and Harley. Glanton is a Ninth Circuit decision that involves a welfare benefits plan. And by definition, in a welfare plan, this one's a medical plan, there is no vested right to a contractually defined level of benefits. So the court says these participants don't have Article III standing to proceed on behalf of the plan to attempt to make the plan whole for losses because the plan's losses have not injured them, and a recovery by the plan will not redress any injury because they haven't suffered an injury to a vested right. Glanton has some other language there that gives me pause. It says something to the effect that the reason there's no redressability is that the prospective benefits depend on an independent actor who retains broad and legitimate discretion that the courts cannot presume either to control or to predict. So in this case, the money would flow, let's say there's a judgment, flows from a court judgment from one of the defendants into PBGC. And after that, the court doesn't have any authority to control or direct what happens. So why isn't that basically the Glanton case? Oh, it's not the Glanton case for several reasons. First of all, the reason that there's this entity that has this discretionary control over what happens to the plan's recovery is that the plan participants don't have any vested rights in that plan. So the employer can take the money and essentially do whatever it wants. It has complete unfettered discretion to use that money for any purpose. Any purpose whatsoever. That's not the case here. These participants have vested rights to a particular level of benefits, and restoring assets to the plan enables PBGC to restore those benefits. That's exactly what the Wilmington Shipping Court held, and that's exactly why Glanton is not relevant here. Harley is the other case, and Harley again shows that the key question is whether there's been an injury to a vested right. In Harley, there's an allegation that the plan's fiduciaries have invested the plan's assets imprudently, causing the plan to lose assets. But because the plan has a funding surplus, the plan's ability to satisfy its obligations hasn't been adversely affected by the imprudence, and therefore, again, the participants don't have article freestanding because they haven't suffered an injury to their vested rights. These participants have suffered an injury to their vested rights. That injury can be redressed. I think it's been amply demonstrated here today by a recovery on behalf of the plan by these participants, and so they have constitutional standing. There isn't anything in Wilmington that says then the plan has to pay them what they would have been entitled to prior to this occurring. Well, that is because in Wilmington, there's a different benefit at issue. The participant in Wilmington is already receiving the amount of his pension that he was entitled to under the plan. So in other words, his pension has not been reduced. What's been taken away from him, and the Wilmington court finds that this is a sufficient redressable injury for constitutional standing, what's been taken away from him is the right to elect a lump sum form of benefit as opposed to a monthly annuity form of benefit, and that's sufficient in Wilmington shipping. Here, of course, we have a much greater injury. I mean, we have an actual reduction in the amount of these participants' monthly pension. Right, but even if you win, I don't know how, listening to what PBGC does, I don't know how you could say that then they're going to get exactly what they would have gotten if this hadn't happened in the first place. I mean, how can you make them do that when you listen to the whole process of what they have to do to go through that? Because, as I have said earlier, and as I think Mr. Finke said, the PBGC shares its recoveries, and if we recovered on behalf of the plan, that would potentially be a recovery by... How do you argue to make whole? What is to make whole? Like $260 million says, okay, that's the number that it was underfunded, but when I'm hearing everything said here on how PBGC does their job, that $260 million might not make them whole. I mean, you're saying make whole because we want to get the benefits that we would have gotten had this never occurred. Well, the language to make good the losses to the plan that it suffered as a result of the breach of fiduciary duty is the language that's in the statute. It's Section 409 of ERISA. It says that a participant through Section 502A2 can bring a claim to make good losses to the plan that are caused by a breach of fiduciary duty. Now, I think that one response to your question might be to say that at the time that the plan terminated, PBGC had an estimate of what its underfunding was, and that was $276 million. PBGC has recovered in the bankruptcy, as Mr. Finke said, and so that may be a smaller number now that's necessary to make the plan whole for its losses from the breach of fiduciary duty. Well, I assume when you're looking at standing, you don't have to recover the whole banana to have standing. In other words, let's say you recovered, you know, $100, and that was the amount at that point that was the shortfall. Would that affect whether you're going to have standing with the amount you would recover in the end? No, certainly not. I mean, you don't need complete relief in order to get some redress. Right. You know, these participants have lost substantial amounts of their money. And to a degree it boils down to, however, whether the control and discretion exercised by PBGC is sufficient to kind of cut almost active and intervening actors. Is that what it ultimately boils down to? Yes, and that's exactly what the Wilmington Shipping Court held PBGC was not doing. And the Wilmington Shipping Court placed a lot of emphasis on PBGC's role as a trustee. It's a statutory trustee, but it's still a trustee. Do you concede, though, if you have standing that the request of relief would have to go to PBGC and not to the appellants? Because it seems to me in the complaint you're asking it to go to them in a certain amount. On the 502A2 claim, that's the ERISA claim for relief to the plan, no, we don't think it has to go to PBGC. We think the court has broad discretion to formulate appropriate equitable relief, which is fine. You're not asking for equitable relief. You're asking for money. Well, in this case, under Section 409, money is equitable relief. I mean, Section 409 says make good losses to the plan or other appropriate equitable or remedial relief. So in this context, I mean, there are contexts. That was the issue with the Supreme Court, right? Potentially that narrow issue. All right, I think that we have well in mind your argument and also the argument of the multiple defendants. Thank you all for the argument. It's an interesting and complicated case. The case of Bowdoin v. CNF is submitted and we're adjourned for the morning.
judges: McKeown, Callahan, Siler